Judy L. Gooderham v. Commissioner.
Gooderham v. Commissioner
Docket No. 95307.
United States Tax Court
T.C. Memo 1964-158; 1964 Tax Ct. Memo LEXIS 179; 23 T.C.M. (CCH) 938; T.C.M. (RIA) 64158; June 8, 1964
*179 Petitioner, a professional ice skater, was employed by and required to travel with the Ice Follies show to various cities except during a lay-off period, without pay, when her employer paid for her transportation expenses back to her home city. Ice Follies stayed temporarily in each city for a short time and paid her a weekly travel allowance for hotel and meals expenses, which was partial reimbursement. Held, that the entire amount of the expenses is deductible as expenses incurred while away from home under sections 62(2) and 162(a)(2), 1954 Code. B. H. Neblett, and Loyd C. Larson, 8600 Melrose Ave., Los Angeles, Calif., for the petitioner. Robert L. Gnaizda, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined a deficiency in income tax for the year 1958 in the amount of $711.13. The question is whether petitioner is entitled to any deduction under sections 62(2)(A) and (B), and 162(a)(2), 1954 Code, for traveling expenses while away from home, paid and incurred in connection with her performance of services as an employee. Findings of Fact The stipulated facts are so found and are incorporated herein by reference. [1]
Petitioner filed her return for 1958 with the district director of internal revenue at Los Angeles, California. The return was accepted and treated as an individual *181 return. In 1958, petitioner was a single person. Her maiden name was July Lawrence. She was born in April 1937 in Canada and at all times has been and still is a citizen of Canada. She married Edward D. Gooderham in Canada, on June 30, 1958. At all times she has had her residence in Canada. Petitioner was first employed by the Ice Follies as a professional ice skater on March 29, 1957, under a standard written contract. She was then close to 20 years old. Petitioner's home address at the time she was employed by the Ice Follies was and continued to be at all times material 241 Bessborough Drive, Leaside, Toronto, Province of Ontario, Canada. This is the address of her parents with whom she made her home until she established her own separate home in Ontario at some time after May 10, 1959. The above address was set forth in petitioner's employment contract and on her payroll cards at all times, and the Ice Follies regarded it as the place of her home. Ice Follies employed petitioner under a three-year contract. On May 10, 1959, the contract was terminated at her request for personal reasons, chiefly because she had married. She did not have any other employment while employed *182 by Ice Follies. Petitioner married Edward D. Gooderham, on June 30, 1958. Edward was then a student taking civil engineering courses at the University of Toronto, and he was not otherwise employed; he did not have any job. Petitioner continued to make her home at the residence of her parents after her marriage, throughout 1958 and part of 1959, and she returned there after she resigned from the Ice Follies on May 10, 1959. The residence at 241 Bessborough Drive was the home from which she departed, to which she returned, where she spent her annual vacations, and to which she returned as often as was permitted by the Ice Follies under the employment contract. After petitioner resigned from the Ice Follies in 1959 and returned to her home at the above address, she and her husband for the first time established their own separate home in the town of Willowdale, Province of Ontario, where they resided until May 1, 1960, when they moved to 32 Old Colony Road, Willowdale, where they still reside. The Ice Follies is the trade name of a partnership, Shipstads & Johnson. Both the partnership and the Ice Follies organization have their offices and principal place of business at 8600 *183 Melrose Avenue, Los Angeles, California. The partnership produces and arranges for the performance of an ice skating extravagaza or show called the Ice Follies. For convenience, petitioner's employer is referred to hereinafter as Ice Follies, and Ice Follies is sometimes referred to as the employer. The partnership owns two buildings where its plant and offices are located. The cost of the buildings, land, and equipment was about $129,000. It employed in the taxable year about 70 workers in its offices and costume production shop, and about 114 individuals in the Ice Follies show, of whom 94 were the performers and the rest were stage hands, electricians, assistants, and managers. Each year a new edition of the Ice Follies is produced requiring new acts, costumes, and music. The show is planned and developed in Los Angeles. Music for the show is written by a musician in Los Angeles, and the new costumes are made and tried on at the Los Angeles shop. New costumes and show properties, which include large animal costumes worn by skaters, cost $275,000 each year; they are designed and made in the costume shop. The production staff holds meetings and works out the plans for each new edition *184 of the show at the Los Angeles offices. All contracts with the partnership and the Ice Follies, including those for purchases of equipment and materials for the show, are executed in Los Angeles. All payroll and other records are maintained at the Los Angeles office; payroll checks are issued there; there is no other office. Employment contracts often are executed in or near the employee's home city. The premiere of each new annual edition of the Ice Follies is in Los Angeles just after Labor Day each year. The show is presented in San Francisco during the summer months and most of the rehearsing for a new edition of the show each year is done in San Francisco. But just before the premiere of the new show, there are final rehearsals and costume fittings in Los Angeles. Each new edition is called the edition of the following calendar year. The premiere of the 1959 edition was presented in September 1958, for example. The Ice Follies was first produced in 1936 and now is in its 28th year. The show features ice skating acts or numbers, music and costumes. In the show there are star performers, principals, and line skaters resembling a chorus. Many of the skaters have achieved gold *185 medals, have won championships in foreign countries and the Olympics, and are highly qualified. All members of the cast are required to be members of the American Guild of Variety Artists, a nation-wide union, and the Ice Follies also at all times has a basic agreement with that union. Petitioner was a member of this union while employed by the Ice Follies. After the Los Angeles premiere in September, the show goes on tour each year over a regular circuit which comprises 19 or 20 cities in the United States, and Montreal and Toronto in Canada. The show is presented for either one, two, or three weeks in each city, except San Francisco, where the show remains for a longer period of time. There is an annual, without pay, lay-off period for the show, beginning in April or May, each year, for about six weeks when the members of the cast return to their homes; and there is a short break in the performances at Christmas. The following was the tour schedule of the Ice Follies during the calendar year 1958. It is typical of the schedule during each calendar year, except for slight variations in some of the cities and dates: CALENDAR YEAR 1958
1957-1958 Edition
Philadelphia
Jan. 1-12
New York City
Jan. 14-26
Syracuse, N. Y.
Jan. 28-Feb. 2
Toronto, Canada
Feb. 3-7
Montreal, Canada
Feb. 9-16
Boston
Feb. 18-Mar. 2
Cleveland
Mar. 4-16
Rochester, N. Y.
Mar. 18-23
Buffalo
Mar. 25-30
Minneapolis
Apr. 2-20
Vacation Lay-off
Apr. 21-June 4
Seattle
June 5-15
San Francisco (End of Edi-
tion)
June 18-Aug. 31
1958-1959 Edition
Los Angeles (Premiere)
Sept. 4-21
Denver
Sept. 24-28
Des Moines
Oct. 1-5
St. Louis
Oct. 7-12
Louisville
Oct. 14-19
Chicago
Oct. 22-Nov. 9
Detroit
Nov. 11-23
Hershey, Pa.
Nov. 25-Dec. 6
New Haven
Dec. 7-14
Philadelphia
Dec. 25-31
*186 Petitioner was required by her employment contract to travel with the Ice Follies to each and all of the 22 cities listed in the above schedule, and to render services to the Ice Follies in each city as and when required by her employer. She was obliged to give 10 performances each week, or one each night and 3 during the day, on certain days. She received extra pay for performances in addition to ten. During 1958, petitioner was a line skater in the chorus. Ordinarily, there are 9 or 10 performances of the show each week; the show is presented every evening except Monday; rehearsals are held during the day. The standard employment contract of Ice Follies (with petitioner and all other performers in the show) obliges the employee to render exclusive services as an artist to Ice Follies wherever Ice Follies might direct; to render such services as directed by Ice Follies; to comply with all reasonable rules and regulations deemed necessary by the employer; and to travel to each city where the show is presented. No employee has any right to determine the city or cities where he or she will perform and render services. All performers are required to comply with prescribed and strict *187 disciplines, including attendance at rehearsals, skating classes, press conferences, interviews, and meetings for arranging and repairing costumes; they are required to pay strict regard to make-up and dress; to perform in acts and numbers as arranged by Ice Follies; and all members of the cast agree not to render services for pay to anyone else except with the consent of Ice Follies, so that the employment contract constitutes an exclusive contract with Ice Follies. The contract is governed by the laws of California. The standard employment contract (with petitioner and all other members of the cast) provides that Ice Follies will provide the employee and pay for rail transportation from the employee's home city, (as shown in the contract) to the city where the employee is to join the show, and will provide the employee and pay for return rail transportation from the city where the show was presented back to the home city. Ice Follies pays for the tour transportation from city to city. Ice Follies recognized Leaside, Toronto, as petitioner's home, and paid her travel expenses back to Leaside when the show recessed for the annual vacation period, and from Leaside to Seattle, Washington, *188 where the show resumed performances in 1958, at the end of the vacation lay-off. Under the standard employment contract (with petitioner and each member of the cast) which was in effect in 1958, Ice Follies agreed to pay and paid each person $52 per week as the maximum travel allowance for the expenses of meals and lodging while the employee was away from the town where his or her home and residence is located. This allowance is in addition to wages. This allowance is not paid to an employee while and if the show is presented in his or her home town, and it is not paid during the vacation lay-off. As a condition for receiving this travel allowance, each employee is required to keep a weekly expense account, to submit it to the Los Angeles office, and to record thereon the amounts paid each day for breakfast, lunch, and dinner, and the amounts paid for lodgings. The weekly allowance of $52 represents a per diem of $7.43. Ice Follies provides each employee in the show with one book for each calendar year containing printed weekly expense account forms in sets of an original and a carbon copy, and requires each employee to itemize expenses on the expense account forms. The details *189 to be filled in are set forth under the days of the week. The employee fills in the names of the city and hotel; the date on which the week ended (always Sunday); and the amounts expended each day for lodgings, breakfast, lunch, and dinner; for train porters, trunk and baggage charges, and taxis between the hotel and station; and for hairdress, make-up, skate cleaning and sharpening, and sundry items. At the bottom of each expense account is a space for the employee's signature following certification that it is "a true and correct report of my actual and deductible expenses for the period indicated." On the cover of the account book the following instruction to the employee is printed: To obtain a deduction of traveling expenses from income and payroll tax return YOU MUST itemize your expenses each day and summarize the totals each week. A copy of this report together with paid hotel bills, etc., should be kept by you as proof of the validity of your deductions for traveling expenses, etc. Expense accounts must be submitted every Monday of each week. A secretary with the show collects the expense accounts and mails them each week to the Los Angeles Office. A manager of Ice *190 Follies makes all of the transportation arrangements and hotel reservations for the tour of the show. Ice Follies pays for train and pullman tickets. He arranges in advance for all members of the touring show to stay at the same hotel and obtains the best rate possible for individual rooms; and he arranges for buses to provide local transportation between the hotel and arena where the show is presented. The travel allowance of $52 per week was the maximum paid by Ice Follies in 1958. In 1958, no employee's traveling expenses for an entire week were less than this amount. But if such expenses were less than $52, Ice Follies would reimburse the employee only for the amount of actual expenses, and if they exceeded $52, the reimbursement was nevertheless limited to the agreed allowance of $52. There never has been an instance where an employee was homeless, or without a home, so that his traveling expenses while on tour with the show were not subject to reimbursement under the travel allowance agreement. Under the standard employment contract in 1958, the $52 per week allowance for meals, lodgings, and other traveling expenses represented reimbursement for such expenses while the employee *191 was away from his home city traveling with the show. Petitioner and all other members of the cast were paid weekly. The payroll check, the attached voucher, and the payroll record of each employee shows in detail the weekly amounts paid for wages and for travel allowance, the respective amounts withheld for income tax, social security tax, and California disability insurance, and the net total amount paid to the employee. The amount of withholding for Federal income tax was computed only on the amount of the employee's weekly wages. Under a ruling of the Internal Revenue Service in 1943, in accordance with section 404.14 of Treasury Decision 5277, the amounts paid to employees for travel expenses were not subject to income tax withholding. This ruling was obtained by both Ice Follies and the union. Ice Follies made a clear segregation of wages from the travel allowance on the payroll checks and vouchers and payroll records. During the 365 days of the year 1958, petitioner was engaged in performing services for and traveling with the Ice Follies for 320 days, and she was at her home in Leaside, Toronto, during 45 days. She did not receive any wages during the 45-day vacation period *192 and, of course, she did not receive any travel allowance during the vacation period. During the 320 days of service to the Ice Follies, petitioner did not receive any per diem allowance for meals and lodging expenses during 9 days. That was due to the presentation of the show in her home city, Toronto, and the policy of not paying any per diem to an employee while performing in his or her home city. Ice Follies paid petitioner the standard travel allowance of $52 per week for traveling away from her home city, Toronto during 311 days and nights. During 1958, Ice Follies paid petitioner wages, overtime, and bonuses in the total amount of $4,785.21. The amounts of her weekly wages varied but averaged about $104 per week before withholdings and deductions, and exclusive of any travel expense allowance. Petitioner received, in addition, the total sum of $2,392.01, travel allowance. However, her actual travel expenses, as shown by her weekly expense accounts, totaled $3,025.49, which was spent for lodgings, meals, taxies between the station and hotel in each city, and tips to porters on trains and for carrying luggage. The parties are agreed upon the amount and nature of all of petitioner's *193 expenses for 1958 in the above amount, and about them there is no dispute. There were withholdings each week from petitioner's wages for Federal income tax, social security tax, and the California disability insurance. For the year they totaled $873.60, which reduced her wages to the net amount of $3,911.61. Petitioner incurred and paid certain business expenses in 1958 totaling $620.64, in connection with her services to Ice Follies, for hairdress, make-up, skating boots, skating blades, the care of skating boots, rehearsal clothes, union dues, photographs, and publicity, which she itemized in her weekly expense accounts. Respondent allowed a deduction for all of these expenses and there is no dispute about any of them. In her return for 1958, petitioner reported gross income of $7,177.22 ($4,785.21, wages, plus $2,392.01 reimbursed travel expenses). She subtracted from gross income her actual traveling expenses in the amount of $3,025.49, which resulted in adjusted gross income of $4,151.73. The meals and hotel expenses, $2,890.49, $9.30 a day, exceeded the reimbursement by $498.48. Petitioner spent $3,025.49 in 1958 for the following expenses, (excluding such expenses *194 while she performed in Toronto): Hotel lodgings
$ 894.74
Meals
1,995.75
$2,890.49
Taxis between stations and
hotels
75.00
Tips to baggage and train
porters
60.00
135.00
$3,025.49
$3,025.49
Respondent disallowed all of the above deduction because it had not been established that this amount constituted ordinary and necessary business expense. He made an adjustment in petitioner's favor for the standard deduction allowable in view of his increasing the amount of taxable income. Petitioner reported in her return taxable income of $2,256.09, and income tax in the amount of $456.34. Since her employer had withheld $743.10 income tax on her wages ($4,785.21), she reported an overpayment of tax in the amount of $286.76, and requested refund thereof. Respondent did not refund $286.76, or any other amount. The residence at 241 Bessborough Drive, Leaside, Toronto, contained 3 bedrooms, one of which was petitioner's room and was maintained at all times for her use alone. All of petitioner's personal belongings and clothing were kept at her home at the above address at all times during 1958 except such items of clothing and personal belongings as she used *195 while on tour with the Ice Follies. Petitioner stayed at her home in Toronto during the without-pay lay-off, when the show was in recess, for 45 days, or a little over 6 weeks (as previously noted), and in addition she went home for allowable short visits during the Christmas lay-off and on four other occasions when the show was giving performances near Toronto, in Chicago, Detroit, Syracuse, and Rochester. Throughout 1958, and prior thereto, petitioner maintained her home in Toronto. Toronto was her home city for business purposes. Petitioner incurred deductible expenses while away from home for meals and hotel lodgings in the amount of $2,890.49, and for transportation costs of $135; total, $3,025.49. Opinion The respondent, at the trial, stated the issue in the following way: If Mrs. Gooderham did not have a home in Toronto, Canada, then she must be denied the entire amount of the claimed deduction. The question is, were the expenses incurred away from home; if they were, then the entire amount is deductible. If they were not, then the deduction must be denied. The parties are now agreed that petitioner made the expenditures for the items and in the amounts set forth *196 in the findings. There is no dispute about the general facts. Respondent's position is that since petitioner's services as an employee were rendered in 22 different cities in 1958 she is precluded from having a home, the expenditures were not incurred away from home because her home was wherever she happened to be, and the expenditures are nondeductible personal expenses. See sections 162(a)(2), 62(2)(A) and (B), 1954 Code. The evidence establishes that petitioner's home city for business purposes as well as the place of her residence was Toronto, Canada, and that she was employed to appear temporarily in the cities in the circuit of the Ice Follies as a member of the cast and to travel with the show. Her absence from Toronto was temporary. Respondent's attempt to stretch Commissioner v. Flowers, 326 U.S. 465, to cover this situation must fail. It is held that the expenses in question were incurred by petitioner while she was away from home. Respondent also relies on James v. United States, 308 F. 2d 204 (C.A. 9, 1962). The James case on its particular facts is distinguishable from the instant case. The question presented is chiefly a fact question. *197 Each case must be decided on its own particular facts. Neither party has cited any case having facts which are closely comparable with the facts here. In principle, however, we regard the following cases as applicable and as support for the claimed deduction: Harry E. Schurer, 3 T.C. 544, 546; Charles G. Gustafson, 3 T.C. [*] and Alois Joseph Weidekamp, 29 T.C. 16, in which the Commissioner acquiesced as to the result, 1958-2 C.B. 8
Petitioner is a professional ice skater and a member of a union. Like Schurer she accepted employment away from her home city, no doubt because she could not earn her living at her trade as profitably if she attempted to do so in that vicinity. She accepted employment by the Ice Follies under its terms set forth in a standard form of contract which incorporated by reference the terms of a basic agreement between the union and Ice Follies. She was required to maintain membership in a nation-wide union, American Guild of Variety Artists. The terms of the employment contract apparently were satisfactory to the union. She could not exercise any preferences about the provisions of the employment contract. There are *198 three provisions in the employment contract which are of particular significance, to which the respondent has not accorded sufficient weight, as follows: First, the employment contract is written so as to specify that the employee's home city is the "point of engagement." This means, for one thing, that the employee is hired at his home city, and the employer agrees that the employee is to return to his home city. Second, the employee is to receive wages only while performing in the show, subject to a guaranty of 15 weeks' employment. The evidence shows that in practice this clause means that no wages are paid during lay-off periods, of which there is at least one every spring for 5 or 6 weeks. (In 1958, it was 6 weeks.) Third, the employer agrees to pay for the employee's rail transportation from the point of engagement, the home city, to the place where the employee joins the show, and back to the home city point of engagement when the show closes, which in practice includes the time when there is a lay-off during a recess. The show is not presented continuously throughout the year. It must be recognized that the Ice Follies show is presented on a seasonal basis with a spring *199 lay-off without pay. In accepting employment, the employee agreed to travel with the show when and as directed, and the employer agreed, at his own expense, to get the employee back to his home city at the beginning of the lay-off period, and thereafter to arrange for his transportation from his home city to the place where the show was resumed after the lay-off. Also, it was understood in advance that the show would be presented in each city for only a short period and the employee would be in each city only temporarily. Under these circumstances, the employment contract fixed the employee's home city as his place of employment and home base, and for practical reasons, from the viewpoint of each party, the employer and the employee, this was necessary. Since the employee does not receive wages during the lay-off, he needs to have a fixed home base; and since the Ice Follies only releases the employee for a recess (without pay) it must be assured that the employee will rejoin the show after the recess. The respondent is incorrect in taking the position that petitioner did not have a home city, a home for business purposes, within the meaning of section 162(a)(2). The employment contract *200 of the Ice Follies, which petitioner was obliged to agree to in order to have her job, is adapted to the way in which the Ice Follies conducts its business and presents a show on a seasonal basis in various cities. Respondent's contentions are the result of a rigid construction of the statute. But the respondent may not expect that every business enterprise and its employees are able to fit into a mold, the form of which is prescribed by the respondent. If that were required, the intended purposes of section 162(a)(2) would be greatly limited by the respondent's inflexible construction of the statute under various fact situations. It is our best judgment that under the present particular facts and circumstances, this is a Schurer type case and the same result should be reached here, as in Schurer, even though there are some differences in the facts. Illustrative of the importance of the three elements in the employment contract, noted above, are the facts that petitioner's earnings were $624 less than they would have been ( $104 per week were not paid for 6 weeks) if there had not been a 6-week lay-off without pay; she returned to Toronto during the lay-off; and the Ice Follies paid *201 her round-trip fare, to Toronto and back to the place where the show was resumed, on account of the seasonal lay-off. In Schurer, pages 545-546, we noted some of the legislative background of the enactment in the Revenue Act of 1921 of the provision allowing deduction of traveling expenses, of which section 162(a)(2) is a counterpart. See Seidman's Legislative History of Federal Income Tax Laws 1938-1961, p. 822. The measure as originally enacted was explained by a member of the House Ways and Means Committee, inter alia, as "a measure of justice" for the benefit of the commercial travelers of the country. See, also, Williams v. Patterson, 286 F. 2d 333, 334-336, (C.A. 5, 1961) where the court, in reviewing the legislative history of section 23(a)(1)(A), 1939 Code, observed "that Congress expressly repudiated a narrow view of the deduction. The Act allows the full amount expended to be deductible * * *. Moreover, there is no express statutory limitation, even as to reasonableness." The court also pointed out, "Between these extremes, however, there are innumerable borderline situations, * * *, that cannot be measured by the length and breadth of a thumb [rule of thumb]. *202 " This Court in Gustafson, supra, p. 999, where the taxpayer traveled in his business 52 weeks of the year, said: Such expenses of a man traveling in the pursuit of his business are of course living expenses, since they are paid for lodging and meals; but it cannot be supposed that the statute paradoxically allows the deduction of traveling expenses and at the same time prohibits the deduction because they are personal and living expenses. Eating and sleeping are as necessary and inevitable expenses of pursuing the business as is riding on trains, and it would be quite inconsistent to classify one among the allowable traveling expenses and the other among the nondeductible living expenses. Under the facts and circumstances, which make this a borderline case, respondent has taken a narrow view of the facts and circumstances under which Ice Follies conducts its business and hires employees. He has failed to give adequate consideration to the relationship between the Ice Follies, as employer, and the union to which all of the employees belonged. The problem here lies within a narrow zone. We believe it closely resembles the situation which exists where an individual *203 engages in a trade which necessitates his belonging to a union and accepting employment for short periods away from his home city and area, where he maintains a fixed and permanent residence. Cf., Harry F. Schurer, supra; and Hartsell v. Wright, 182 F. Supp. 725, affd. 305 F. 2d 221 (C.A. 9, 1962) (not cited by petitioner). In applying sections 62(2) and 162(a)(2) to various situations, there does not appear to be a single rule which will correctly fit every case and it is necessary to decide each case on its particular facts under general principles. The three conditions for allowing a deduction for travel expenses which are set forth in Commissioner v. Flowers, supra, are complied with here. The traveling required of petitioner by her employer was the essential and primary requirement of her employment. The traveling of petitioner was solely in the pursuit of her employer's business. All of the amounts expended by her during 1958, for meals, hotel lodgings, station-to-hotel-and-return taxi fares, tips to porters, were incurred in order to meet the exigencies and demands of her employment and the exigencies of her employer's business. *204 She was required to sleep where her employer arranged hotel accommodations during the tour, and to eat at such times as to be ready and able to perform in the show. Sections 62(2) and 162(a)(2) allow the deduction of meals and lodging expenses incurred while away from home in the pursuit of a trade or business, which otherwise are treated as nondeductible personal living expenses, Charles G. Gustafson, supra, and the statute does not impose any limitation upon the deduction dependent upon the length of time the individual is in travel status. The comptroller of the Ice Follies testified that while the members of the cast are on active duty (i.e., paid wages) there is no period when the show is not being presented except when traveling and during a brief lay-off at Christmas time, and that all rehearsals (which are held during the daytime) take place while the show is being presented. Accordingly, with respect to the issue presented, it is of no significance that the employees are in a few cities for a longer time than in others. In summary: Petitioner did not abandon her permanent home in Toronto at any time. She intended to return and returned to Toronto, and to her *205 permanent residence there, each year during the lay-off and at other times, whenever possible. That she would return to Toronto during the lay-off period was part of the employment contract. She had a business home base in Toronto, as well as her personal home, for the relevant purposes of sections 62(2) and 162(a)(2). She was neither a homeless nor an itinerant individual. Petitioner's employment by the Ice Follies was upon the condition that she would travel with the show wherever and whenever directed, and it was known in advance that in each city the employment would be for a temporary period. Petitioner could not move her residence to her places of employment and, on the other hand, she needed to have a home city for business purposes and to maintain a home there to which she could return during the lay-offs without pay. She had no choice about the cities where she would perform and was under the constant supervision of her employer who imposed rigid disciplines. Under the particular facts of this case, we hold that the disputed expenses were away-from-home traveling expenses. Under the employment contract, the $52 per week allowance, a per diem of $7.43, was intended for meals *206 and lodgings expenses. Petitioner's actual expenses for these purposes, $2,890.49, an average of $9.30 a day ($2,890.49 for 311 days), are deductible. The other expenses for taxis and tips, $135, are also deductible traveling expenses. Respondent erred in disallowing a deduction of $3,025.49. Decision will be entered for the petitioner. Footnotes
1. The parties have stipulated that the record, including general exhibits, in a related case, Docket No. 95329, Patricia A. Ruby Hall, applies to this case with respect to the general and relevant facts, excepting the facts which specifically are pertinent in the Hall case. Each taxpayer was an employee of the Ice Follies.↩